FILED
JAMES BONINI
CLERK

2009 APR 21 PM 3: 32

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION (AT DAYTON)**

| | | |
|---|---|---|
| **BARCO, INC.,** a Delaware Corporation, | : | **CASE NO.** **3 : 09 cv 0157** |
| **Plaintiff,** | : | **Judge** **WALTER HERBERT RICE** |
| | : | |
| v. | : | |
| | : | |
| **Q4 SERVICES, LLC,** a Florida Limited | : | **COMPLAINT WITH JURY DEMAND** |
| Liability Company, | : | **AND REQUEST FOR** |
| | : | **PRELIMINARY INJUNCTION** |
| **Defendant.** | : | |

Plaintiff Barco, Inc. ("Barco") sets forth the following Complaint against Defendant Q4

Services, LLC ("Q4").

## PARTIES

1.      Barco is a corporation, organized and existing under the laws of the State of

Delaware with a place of business located at 600 Bellbrook Avenue, Xenia, Ohio.

2.      Barco is the successor in interest to Barco Simulation, LLC.

3.      Barco designs, manufactures and sells visual display solutions for a variety of

applications, including flight simulators, as well as for ship bridge and air traffic control

applications.

4.      Upon information and belief, Q4 is a limited liability company, organized and

existing under the laws of the State of Florida, with its principal place of business at 1410 North

Goldenrod Road, Suite 7, Orlando, Florida.

933797.1

## JURISDICTION AND VENUE

5.     The Court has original jurisdiction over the claims arising under the Lanham Act, 15 U.S.C. § 1125 *et seq*., pursuant to 28 U.S.C. § 1331.

6.     The Court has supplemental jurisdiction over the remaining claims in this action pursuant to 28 U.S.C. § 1367.

7.     The amount in controversy in this action, exclusive of interests and costs, exceeds $75,000.

8.     The Court, therefore, also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as an action between citizens of different states.

9.     Q4 has transacted business in Ohio by contracting to supply goods and/or services to Barco in Xenia, Ohio, including but not limited to Q4 entering four contracts with Barco, at least two of which are for the supply goods and/or services to Barco in Xenia, Ohio as described more fully below.

10.    Among other contacts, Q4 representatives traveled to Xenia, Ohio to meet with representatives from Barco to initiate the relationship between the parties.

11.    Q4 representatives also traveled to, provided services in, and did work on goods it produced in Xenia, Ohio for Barco.

12.    Q4 routinely communicated with Barco in Xenia, Ohio regarding the parties' contract for goods and/or services and were aware that Barco was doing business under the parties' contracts from Xenia, Ohio.

13.    Q4 breached its express and implied warranties to Barco by failing or refusing to honor the warranty commitments it made to Barco in the parties' contract as described more fully below, thereby causing injury in Xenia, Ohio to Barco.

2

14.    Upon information and belief, Q4 regularly does or solicits business in Ohio.

15.    Q4 has engaged in a persistent course of conduct of misappropriation of trade secrets and unfair competition in Xenia, Ohio against Barco.

16.    Q4 has derived substantial revenue, in excess of $500,000, from goods sold in Ohio and services rendered in Ohio

17.    Q4 has caused tortious injury to Barco in Xenia, Ohio by the acts and omissions described more fully below, which took place both inside and outside Ohio, that Q4 knew or reasonably should have known would cause tortious injury in Xenia, Ohio to Barco.

18.    Accordingly, a substantial part of the events or omissions giving rise to the claims alleged below occurred in Xenia, Ohio, which is in this judicial district.

19.    Based on the foregoing, Q4 knew or should have reasonably anticipated that it would be required to litigate its disputes with Barco in Ohio and in this district.

20.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## BACKGROUND FACTS

21.    Barco, Inc. is a wholly owned subsidiary of Barco, N.V. (the "Barco Group"). The Barco Group is a global technology company which designs and develops visualization solutions for a variety of markets, including medical, media, defense, education and other commercial and training applications. The Barco Group is a world leader in the field of visual displays and visualization solutions and is an innovator in its approach to solving complex problems through the use of cutting-edge visualization technology.

22.    Barco is the Barco Group's subsidiary responsible for most operations in the United States. Barco develops, manufactures and sells many visualization solutions in the United States, including collimated display systems for use in the commercial and military

3

simulation market. Barco's United States simulator business operations are located in Xenia, Ohio.

23. Barco and its competitors are constantly seeking to develop and employ technological advances to improve the realism and value of the simulator experience for military and commercial customers. When collimated display systems are incorporated into simulator applications, Barco customers can simulate all types of commercial and military environments. A flight simulator using a collimated display system allows the pilot and co-pilot to jointly train in a three dimensional environment which provides unparalleled realism for actual flying and combat conditions.

24. A collimated display system generally consists of: a) a user interface (which is generally a mock up of the environment being simulated, such as an aircraft cockpit), b) mounted projectors that broadcast the image being simulated onto or through a projection screen, c) a projection screen that projects the image on to a specialized mirror, called a collimating film mirror, and d) a collimating film mirror, which reflects to the user the image being simulated in a three dimensional, real world manner.

25. Barco manufactures some of its own component parts for its collimated display systems, but also looks to other vendors to supply other component parts.

26. As of June 2006, Q4 had specialized knowledge and skill in a process for placing metalized polyester film ("Mylar film") on a collimating mirror's supporting structure, called a vacuum plenum. The process of placing Mylar film on the vacuum plenum is called "skinning," or it is called "re-skinning" when new Mylar film is placed on an existing vacuum plenum.

27. Prior to June 2006, Q4's business was limited to skinning and re-skinning existing collimating film mirrors, increasing the field-of-view for existing collimated mirrors (*i.e.*, from

4

150 degree field-of-view to 180 degree field-of-view), and upgrading or replacing projectors in commercial flight simulators.

28.     Prior to collaborating with Barco, Q4 represented that it had some relevant knowledge in the design and manufacture of film mirrors. But, on information and belief, Q4 never designed, engineered or manufactured any collimating film mirrors or collimated display systems on or before June 20, 2006.

29.     In 2006, Barco was working on a technological innovation to increase the performance of collimated display systems by improving the visual reality for military and commercial flight simulators.

30.     Barco had already substantially designed a collimating film mirror which could be scaled up or down depending on the specific application (the "Barco Design"). While the Barco Design was not then refined into detailed production level drawings, Barco had spent considerable effort and money in researching and developing the innovative combinations of new and existing technology for collimating mirrors into the Barco Design. Moreover, the Barco Design was embodied in numerous Computer Assisted Design ("CAD") drawings and in other research materials and specifications.

31.     At the time, Barco was considering manufacturing collimating film mirrors on its own or using other existing and potential collimating film mirror vendors to assist in putting the design into production. Barco sought a collimating mirror vendor that would produce mirrors exclusively for Barco. Q4 expressed interest in undertaking this role.

32.     On or about June 20, 2006, Barco and Q4 signed a Non-Disclosure Agreement ("NDA") to facilitate discussion between the two companies related to the development and supply of collimating film mirrors by Q4 for use in Barco's collimated display systems.

5

33.     Among other things, the NDA stated in Article 1 that the purpose of the NDA was to "set forth the rights and obligations of the parties with respect to the use, handling, protection, and safeguarding of Proprietary Information which is disclosed by and between the parties hereto relating to Polyester Film Mirror technology for the purpose of cooperating on potential collimated display projects."

34.     The NDA defines Proprietary Information as "technical data and other information (including but not limited to descriptions, drawings, compositions, business and financial information, and computer software) which is related to the subject matter set forth in Article 1."

35.     The Proprietary Information disclosed under the NDA was to "be used solely for the purpose stated in Article 1 and shall not otherwise be used for the benefit of the recipient or others."

36.     On or about June 22, 2006, Al Herman of Barco met with Mike Ponder of Q4 and others at Barco's Xenia, Ohio facilities to negotiate an agreement where the two parties would collaborate to produce certain collimating film mirrors.

37.     Barco initially agreed to provide Proprietary Information related to the design of the vacuum plenum that is used to support the reflective Mylar film.

38.     Q4 agreed to manufacture the vacuum plenum and its supporting components, and "skin" the Mylar film to the plenum exclusively for Barco.

39.     Q4 agreed to an exclusive arrangement with Barco in order to provide Q4 with an opportunity to manufacture a product that it had not previously made and to expand its business from commercial simulation support and refurbishment into a new and growing market area.

40. On or about July 28, 2006, Barco sent Q4 CAD drawings, specifications and other critical Proprietary Information related to the Barco Design.

41. Without the Barco Design and other Barco Proprietary Information, Q4 did not have the ability and information necessary to manufacture collimating film mirrors which would be competitive for a wide variety of commercial and military applications.

42. After review of the Barco Design data, Q4 stated, among other things, that the mirror design "looked very comprehensive" and "we really like what we see," and the Barco Design information would mean "the cost of development will be reduced" because Q4 would not be required to start from "ground zero."

43. Q4 requested and received limited permission from Barco to use the Barco Design and Proprietary Information to bid on a collimated display system proposal being sent to Rockwell Collins for the Boeing 737NG Program (the "Rockwell Collins Proposal").

44. Q4 and Barco signed a Memorandum of Understanding ("MOU") dated August 15, 2006, among other things, to memorialize this limited use of the Barco Design in the Rockwell Collins Proposal.

45. The MOU stated that "Barco is investigating the possibility of designing and manufacturing a new collimated display system for sale into both the commercial and military simulation markets."

46. The MOU also stated that "Q4 has expressed interest in supplying mirrors exclusively to Barco for Barco's collimated display system" and that as a result the Parties agreed that Q4 could submit the proposal and include the Barco Design subject to certain conditions.

7

47.     The MOU included a condition that if Q4 was awarded the contract under the

Rockwell Collins Proposal and Barco got final executive approval to proceed with the project,

then Barco and Q4 would work together to deliver the system based on the Barco Design, but if

there was no executive approval at Barco, then Barco would grant Q4 a royalty-free license to

use the Barco Design only for carrying out the Rockwell Collins Proposal.

48.     The MOU expressly stated that "[n]o other rights to the Barco design are

contemplated under this MOU," and "[t]his is the entire agreement between the parties related to

Q4's authorization to use Barco's design in their proposal to Rockwell Collins."

49.     All the information used by Q4 related to the Barco Design in the Rockwell

Collins Proposal was subject to the MOU and the NDA.

50.     On or about December 6, 2006, Q4 and Barco signed the "Film Mirror

Development and Supply Agreement" ("FMDSA").

51.     Under the FMDSA, Q4 agreed to help Barco complete the development of

collimating film mirror products based on the Barco Design, which would be scalable for various

applications (the "Film Mirrors").  Q4 also agreed to exclusively manufacture Film Mirrors for

Barco and Barco agreed to purchase minimum quantities of Film Mirrors.  Barco purchased the

required minimum quantities.

52.     Under Section 2.2 of the FMDSA, "any and all film mirrors manufactured by Q4"

during the term of the FMDSA were expressly made subject to the terms of the FMDSA.

53.     Section 3.1 of the FMDSA states that "Barco shall have primary responsibility for

the top-level engineering design of the Film Mirror.  As requested by Barco, Q4 shall review the

design and provide recommendations for changes or improvements.  The design shall be

8

sufficiently generic and flexible to accommodate different fields of view as required by both commercial and military flight simulation applications."

54. Section 16.1 of the FMDSA states that as of the date of the signing of the FMDSA, Q4 has an "existing business" of "maintaining and upgrading simulators," which included "selling metalized polyester film, re-skinning film mirrors, increasing the field-of-view of existing mirrors, and upgrading/replacing projectors in commercial flight simulators." The parties agrees that Q4 would be permitted to continue it existing business in these areas without breaching the FMDSA.

55. After delivery of the initial Barco Design details and Proprietary Information to Q4 on July 28, 2006, Barco continued to provide Q4 with additional proprietary engineering data and information, including written engineering specifications.

56. Echoing the NDA and MOU, the Parties agreed under Section 5.1 of the FMDSA that "Barco shall own the design of the Film Mirror."

57. The FMDSA also contains a non-compete provision, restricting Q4 from competing with Barco, as follows:

> 15.1 While this Agreement is in force, Q4 shall not compete with Barco on any program or market opportunity for a collimated display that includes the Film Mirror. Q4 shall not market or sell the Film Mirror to Barco's competitors without the written consent of Barco.
>
> 15.2 Q4 shall have the right to sell single Film Mirrors in cases where Q4 found the opportunity independent of Barco, and Barco was not aware of the opportunity. The intent is to allow Q4 to pursue single-mirror opportunities that are normally part of a system upgrade where Q4 is already engaged with the customer and Barco is not already pursuing the opportunity.
>
> 15.3 If Barco chooses not to pursue an opportunity, Q4 is free to independently pursue the opportunity using the Film Mirror.

9

58.     Under Section 12.3 and Section 21.0 of the FMDSA, the parties agreed that in the event of litigation regarding the FMDSA, the prevailing party will be paid reasonable attorneys' fees and costs.

59.     The FMDSA also included a Non-Disclosure and Non-Use Agreement ("ND/NUA") as a separate attachment.

60.     Under Paragraph 2 of the ND/NUA, the Parties agreed that during the period of the FMDSA and for 3 years thereafter, a party receiving any Proprietary Information under the FMDSA would not disclose, reverse engineer, or use any of the Proprietary Information for any purpose other than that project with certain limited exceptions.

61.     On or about January 3, 2007, Q4 issued an invoice to Barco to cover 50% of the costs of developing an initial Film Mirror based on the Barco Design, which Barco paid (the "Barco Film Mirror Development Payment"). Barco intended to incorporate this initial Film Mirror (the "Demo Mirror") into a collimated display system for use in demonstrating the superior visualization capabilities of this innovative technology.

62.     By late February or early March of 2007, Q4 created or had created molds for fabrication of and actually fabricated segments of Film Mirrors based on the Barco Design (the "Film Mirror Molds").

63.     Sometime in 2007, Q4 manufactured a film mirror. Q4 had never previously produced a collimating film mirror of any type. At some point thereafter, Q4 began to assert that this initial mirror was produced pursuant to an independent design developed by Q4 (the "Alleged Independent Q4 Mirror").

64.     The Alleged Independent Q4 Mirror does not meet all of Barco's specifications and was not satisfactory for all of Barco's needs. But on information and belief, the Alleged

10

Independent Q4 Mirror was in significant part based on the Barco Design and other Proprietary Information provided by Barco.

65.     In any event, under the FMDSA Q4 was obligated to manufacture collimating film mirrors only for Barco and agreed that Barco would own any intellectual property in the design of any film mirror developed as a result of Q4's relationship with Barco, including the Alleged Independent Q4 Mirror.

66.     Q4 used some or all of the Barco Film Mirror Development Payment to fund production of the Alleged Independent Q4 Mirror. This Alleged Independent Q4 Mirror could not have been produced by Q4 without use and reliance upon the Barco Design and other Proprietary Information provided by Barco.

67.     During April of 2007, Barco submitted a bid for delivery of several collimating film mirrors for a collimated display system for the United States military (the "Military Project"). The Military Project consisted of three collimated display systems for training pilots for combat missions using a state of the art flight simulator. The Film Mirrors proposed for the Military Project were based on the Barco Design.

68.     In August of 2007, Barco learned that it had won the bid for the Military Project. Barco then sent Q4 a Purchase Order dated Oct. 10, 2007 ("Purchase Order") for three Film Mirrors required for the Military Project.

69.     The Purchase Order incorporated the FMDSA and attached a specification based on the Barco Design. Barco eventually paid Q4 substantially more than one-half million dollars for the Film Mirrors covered by the Purchase Order.

70.     In November 2007, Monica Ponder of Q4 accepted the Purchase Order on behalf of Q4.

11

71.     During 2008, Q4 asserted that none of the Film Mirrors it was producing for Barco were subject to the terms of the FMDSA and that Q4 owned the design for all film mirrors it then had in production.

72.     Alternatively, Q4 also falsely alleged Barco had breached the FMDSA and questioned whether the FMDSA was still in force based on the alleged breaches by Barco.

73.     Despite that posturing, Q4 and Barco continued to conduct business under the FMDSA and Purchase Order. Barco sent Q4 additional confidential and proprietary information, and Q4 produced the Film Mirrors for the Military Project as required by the Purchase Order.

74.     In early 2008, Q4 began to assert that it would not supply Barco with Film Mirrors unless Barco would agree to allow Q4 to compete with Barco using mirrors it had developed based on the Barco Design. Barco declined to amend the terms of the NDA, MOU and FMDSA to allow Q4 to sell any collimating film mirrors based on the Barco Design in competition with Barco.

75.     Later in 2008, Q4 refused at various times to deliver the Film Mirrors for the Military Project. Q4's threats were intended to force Barco to allow Q4 to sell collimating firm mirrors based on the Barco Design in competition with Barco. Barco again refused.

76.     Despite Barco's repeated refusal to allow Q4 to use the Barco Design or to compete with Barco except as permitted by the NDA, MOU, and/or FMDSA, upon information and belief, since May 2008, Q4 has been demonstrating and selling the Alleged Independent Q4 Mirrors based on the Barco Design and other Barco Proprietary Information to current and potential Barco customers. The Alleged Independent Q4 Mirror is sometimes marketed under the trade name "SupraVue 200".

12

77.     For example, upon information and belief, Q4 contracted with Sim Industries in May 2008 to provide it with multiple collimating film mirrors based on the Barco Design.

78.     During June of 2008, Q4 delivered the first of three Film Mirrors for the Military Project to Barco. The delivery was late and made only after Barco communicated to Q4 that it would file litigation if necessary to force Q4 to deliver the mirror in compliance with the FMDSA and Purchase Order.

79.     After receiving and testing the first Film Mirror for the Military Project, Barco informed Q4 that the Film Mirror was out of adjustment, which made the entire display system non-functional.

80.     Barco requested, pursuant to the warranty provisions in the parties' agreement, that Q4 adjust the Film Mirror to make it operate properly.

81.     Q4 refused to conduct the warranty work under the terms of the agreements, but instead insisted that it be paid separately for that work.

82.     Due to the impending delivery deadlines on Barco under the Military Project, Barco was forced to pay Q4 separately for the warranty work in order to avoid causing delays in delivery of the critical flight simulators to the military and to avoid breaching Barco's contract with its customer for sale of the Film Mirrors.

83.     Q4 now falsely advertises on its website that the mirrors sold to Barco under the FMDSA and Purchase Orders, which were produced based on Barco's specifications and the Barco Design, were in fact a new Q4 mirror product it calls "ArpusVue."

84.     On November 24, 2008, Barco gave Q4 a final request to deliver the Demo Mirror which had been ordered in 2007 and for which Q4 had been paid the Barco Film Mirror Development Payment.

85. When Q4 failed to respond to this notice as requested, Barco gave Q4 notice that Q4 was in default of the FMDSA.

86. To this date, Q4 has failed to deliver the Demo Mirror and refuses to deliver any other film mirrors as required by the FMDSA.

## COUNT I
## (Misappropriation of the Barco Design)

87. Barco incorporates Paragraphs 1 through 86 of this Complaint as if fully set forth here.

88. Q4 has violated the Ohio Uniform Trade Secrets Act, O.R.C. § 1333.61 *et seq*.

89. Barco entrusted Q4 with Barco's confidential and proprietary information, including but not limited to the Barco Design and other Proprietary Information it received from Barco under the NDA, MOU, and/or FMDSA and the Purchase Order (the "Barco Confidential Information").

90. The Barco Confidential Information constitutes "trade secrets" within the meaning of Ohio Uniform Trade Secrets Act, O.R.C. § 1333.61(D).

91. The Barco Confidential Information has independent value, actual or potential, from not being generally known to others by proper means who can obtain economic value from its disclosure or use.

92. Barco has undertaken reasonable efforts to maintain the secrecy of the Barco Confidential Information, including use of the confidentiality and intellectual property provisions of the NDA, MOU, FMDSA and/or the Purchase Order.

93. Q4 acquired the Confidential Information through its contractual relationships with Barco and, upon information and belief, has improperly used this information for its own financial gain, including development and sale of the Alleged Independent Q4 Mirror and in

14

violation of the NDA, MOU, FMDSA and/or the Purchase Order. Q4 is also currently marketing the identical mirror based on the Barco Design that it delivered to Barco under the Purchase Order for the Military Project.

94. Upon information and belief, Q4 has willfully and maliciously misappropriated Barco's Confidential Information with a conscious and reckless disregard for the legal rights of Barco.

95. Upon information and belief, Q4 considers itself unrestrained and has used or will use Barco's Confidential Information to attempt to compete with Barco in the sale of, among other things, collimated display systems that incorporate collimating film mirrors.

96. Q4 has and is attempting to obtain business from current customers of Barco and prospective customers of Barco through the use of Barco's Confidential Information, without the express or implied consent of Barco.

97. The misappropriation of Barco's Confidential Information was, at all times, intended to benefit Q4 and facilitate its unfair competition with Barco.

98. The disclosure and use of Barco's Confidential Information is a misappropriation of trade secrets and has caused and will further cause Barco irreparable harm, including damage to Barco's legitimate business interests in maintaining control over its intellectual property and loss of goodwill.

99. As a direct and proximate result of Q4's misappropriation and use of Barco's Confidential Information, Barco has also suffered and will suffer significant financial losses and other damages, as well as attorneys' fees and costs. In addition, Q4 has been unjustly enriched through avoidance of research and development costs and from profits earned on the sale of products produced through the misappropriation and use of Barco's Confidential Information.

100. Barco is also entitled to punitive and/or treble damages and an award of attorney fees under the Ohio Uniform Trade Secrets Act for Q4's willful and intentional misappropriation of Barco's Confidential Information.

**COUNT II**
**(Breach of the NDA/MOU – Improper Use of Barco Design)**

101. Barco incorporates Paragraphs 1 through 100 of this Complaint as if fully set forth here.

102. As a result of the NDA and MOU, Q4 owed Barco a duty to protect from disclosure, or to refrain from using for any purpose other than Q4's collaboration with Barco, the Barco Confidential Information, including the Barco Design, except for limited, use related to the Rockwell Collins Proposal.

103. Q4 was not entitled to use the Barco Design or any Barco Confidential Information under the terms of the NDA and MOU except in its collaboration with Barco for the creation, design, engineering, and manufacture of collimating film mirrors exclusively for Barco.

104. Q4 never won the bid for the Rockwell Collins Proposal and, therefore, never had any right to use the Barco Design or any other Barco Confidential Information under the terms of the NDA and MOU for any other purpose.

105. Q4 has used the Barco Design and the other Barco Confidential Information for its own financial gain, including development of the Alleged Independent Q4 Mirror and marketing and sale of the SupraVue 200 and AprusVue branded mirrors.

106. Q4 has used the Barco Design and other Barco Confidential Information to sell film mirrors to former, current, and previously identified potential Barco customers, including but not limited to Sim Industries.

107. Q4 materially breached the NDA and MOU by the acts and practices set forth above.

108. The misuse and disclosure of Barco Confidential Information has caused and will further cause Barco irreparable harm, including damage to Barco's legitimate business interest in maintaining control over its intellectual property and loss of goodwill.

109. As a direct and proximate result of Q4's breach of the NDA and MOU, Barco has suffered and will suffer significant financial losses and other damages in an amount to be proven at trial.

## COUNT III
## (Breach of the FMDSA/Purchase Order – Improper Use of Barco Design)

110. Barco incorporates Paragraphs 1 through 108 of this Complaint as if fully set forth here.

111. As a result of the FMDSA and the Purchase Order, Q4 owed Barco a duty to protect the Barco Confidential Information from disclosure and to refrain from using it for any purpose other than Q4's collaboration with Barco, including the Barco Design, except for limited purposes described in the FMDSA and Purchase Order.

112. Q4 was not entitled to use the Barco Design or any other Barco Confidential Information except in its collaboration with Barco for the creation, design, engineering, and manufacture of collimating film mirrors exclusively for Barco.

113. Q4 used the Barco Design and the other Barco Confidential Information for its own financial gain and advancement of a separate, competing collimating film mirror development program.

17

114.    Q4 has used the Barco Design and other Barco Confidential Information to sell
film mirrors to former, current, and previously identified potential Barco customers, including
but not limited to Sim Industries.

115.    Q4 materially breached the FMDSA and Purchase Order by the acts and practices
set forth above.

116.    The misuse and disclosure of Barco Confidential Information has caused and will
further cause Barco irreparable harm, including damage to Barco's legitimate business interest in
maintaining control over its intellectual property and loss of goodwill.

117.    As a direct and proximate result of Q4's breach of the FMDSA and Purchase
Order, Barco has also suffered and will suffer significant financial losses and other damages in
an amount that will be proven at trial.

118.    Barco is entitled to recover its costs and attorneys' fees as a result of Q4's
breaches of the FMDSA and Purchase Order.

## COUNT IV
### (Breach of the FMDSA – Violation of Non-Compete Obligation)

119.    Barco incorporates Paragraphs 1 through 118 of this Complaint as if fully set
forth here.

120.    Q4 has actively offered film mirrors and/or collimated displays including film
mirrors for sale violation of the non-competition provision in the FMDSA.

121.    Under the terms of the FMDSA, Q4 obtained Barco Confidential Information,
including but not limited to the Barco Design.

122.    Q4 has used Barco's Confidential Information to compete directly with Barco, in
violation of Q4's non-compete obligations.

18

123. Barco has a legitimate business interest in protecting the secrecy of Barco Confidential Information and maintaining written relationships.

124. Q4 materially breached the FMDSA, including the non-compete provision, by the acts and practices set forth above.

125. As a direct and proximate result of Q4's breach of the FMDSA, Barco has suffered and will continue to suffer serious and irreparable harm, including damage to Barco's legitimate business interests in maintaining control over its intellectual property and loss of customer goodwill.

126. As a further direct and proximate result of Q4's breach of the FMDSA, Barco has sustained significant financial losses and other damages in an amount to be proven at trial. Barco is also entitled to an award of attorney fees and costs.

<b>COUNT V</b><br>
<b>(Breach of the FMDSA and Purchase Order – Failure to Deliver Film Mirrors as Ordered)</b>

127. Barco incorporates Paragraphs 1 through 126 of this Complaint as if fully rewritten herein.

128. Barco paid for the development of the Film Mirrors, provided technical expertise and resources, provided design documents and support, and ordered Film Mirrors under the FMDSA.

129. Q4 materially breached the FMDSA, by, among other things, failing to deliver the Demo Mirror, refusing to supply Barco with additional Film Mirrors under the FMDSA and late delivery of Film Mirrors for the Military Project.

130. As a direct and proximate result of Q4's breach of the FMDSA, Barco has suffered and will suffer significant financial losses and other damages in an amount to be proved at trial. Barco is also entitled to an award of attorneys' fees and costs.

19

## COUNT VI
### (Breach of the FMDSA and Purchase Order – Failure to Honor Warranty)

131.    Barco incorporates Paragraphs 1 through 130 of this Complaint as if fully rewritten herein.

132.    Q4 agreed to warrant the performance of the Film Mirrors produced under the FMDSA and/or the Purchase Order.

133.    Barco sought to have Q4 comply with its warranty obligations when the first Film Mirror delivered under the Military Project was out of adjustment.

134.    Q4 materially breached the parties' agreement when it refused to honor its warranty obligations and demanded that Barco pay for the warranty work separately.

135.    Barco was forced by Q4 to pay for the warranty work separately, despite Q4's warranty under the parties' agreement, as a result of Q4's refusal to honor those obligations.

136.    As a direct and proximate result of Q4's breach of the FMDSA, Barco has suffered and will suffer significant financial losses and other damages in an amount to be proven at trial.  Barco is also entitled to an award of attorneys' fees and costs.

## COUNT VII
### (Unfair Competition, Lanham Act, 15 U.S.C. § 1125 *et seq.*)

137.    Barco incorporates Paragraphs 1 through 136 of this Complaint as if fully rewritten herein.

138.    The film mirrors that were produced by Q4 for the Military Project were produced based on Barco Confidential Information, including the Barco Design.

139.    The design and other rights to the Military Project film mirrors are owned by Barco pursuant to the NDA, MOU, FMDSA and Purchase Order.

140. Q4 has falsely claimed and advertised on its website and, upon information and belief, other media and documents that the film mirrors sold to Barco under the FMDSA and Purchase Order for the Military Project were Q4 proprietary film mirrors called "ArpusVue."

141. Q4 has also falsely claimed and/or suggested on its website that Barco endorses its products and/or that it is satisfied with the work that Q4 has done for Barco.

142. These misleading representations, false designations of origin, and false descriptions of fact in Q4's sale of goods and services in interstate commerce, each individually and also in combination, are likely to cause confusion or mistake, or to deceive consumers of such goods and services as to the origin and ownership of Military Project film mirrors.

143. These misleading representations, false designations of origin, and false descriptions of fact in Q4's sale of goods and services in interstate commerce, each individually and also in combination, are likely to cause confusion or mistake, or to deceive consumers of such goods and services as to the approval or endorsement of Q4's goods, services, or commercial activities by Barco.

144. As a direct and proximate result of these acts of unfair competition by Q4, Barco has suffered and will continue to suffer significant financial losses and other damages in an amount to be proven at trial. Barco is also entitled to attorney fees and the cost of this litigation.

145. Q4 has made the misleading representations, false designations of origin, and false descriptions of fact in Q4's sale of goods and services with a conscious, malicious and reckless disregard for Barco's legal rights, entitling Barco to treble damages.

146. Q4's has caused Barco irreparable harm for which there is no adequate remedy at law. Injunctive relief is proper to force Q4 to cease making these misleading representations,

21

false designations of origin, and false descriptions of fact and to enjoin Q4 from making any similar representations in the future.

## COUNT VIII
### (Declaratory Judgment – Intellectual Property Rights under the NDA, MOU, FMDSA, and Purchase Order)

147.    Barco incorporates Paragraphs 1 through 146 of this Complaint as if fully set forth here.

148.    Under the terms of the NDA, MOU, FMDSA, and/or Purchase Order, Barco had exclusive ownership rights to the Barco Design and all drawings, specifications, engineering documentation and other Barco Confidential Information related to the Barco Design (the "Barco Intellectual Property").

149.    Q4 has claimed and continues to claim that it owns the design and other rights in any collimating film mirrors it has developed since the inception of its relationship with Barco. This assertion by Q4 is in direct conflict with Barco's ownership rights in the Barco Intellectual Property and raises an actual controversy between Barco and Q4. The controversy is within the power of this Court to resolve pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

150.    The disputes at issue in this Request for Declaratory Judgment are real, substantive and concrete.

151.    Barco is entitled to a declaration that it has exclusive ownership of the Barco Intellectual Property. Barco is also entitled to a declaration that it has exclusive ownership of all designs, drawings, specifications and other documentation used by Q4 which were derived from the Barco Intellectual Property, including the design of the Alleged Independent Q4 Mirror.

22

152.    This Court's determination of the issues presented by the actual controversy between Barco and Q4 will afford relief from the uncertainty, insecurity and controversy with respect to the rights, status and legal relations between the parties.

153.    A declaration of the parties' respective rights will settle the conflicting and disputed claims of the parties, will afford them the security of knowing precisely what their respective rights are with regard to the Barco Intellectual Property, and will prevent multiplicity of actions and detrimental results that will arise if the parties continue their present course of action without a judgment from this Court.

154.    Declaratory relief is equitable, necessary and proper under the circumstances presented by this case.

## PRAYER

**WHEREFORE**, Barco prays for judgment in its favor as follows:

1.    For judgment in Barco's favor and against Q4 for misappropriation of Barco's Confidential Information based on Q4's improper use of the Barco Design and other information received under the NDA, MOU, FMDSA and/or Purchase Order and for all damages, costs arising from the misappropriation;

2.    For punitive and/or treble Barco's damages O.R.C. § 1333.63(B) and an award of attorney fees;

3.    For judgment in Barco's favor and against Q4 for breach of the NDA and MOU for its improper use of the Barco Design and other Barco Confidential Information and for all damages and costs arising from the breach;

4.    For judgment in Barco's favor and against Q4 for breach of the FMDSA and/or Purchase Order for its improper use of the Barco Design and other Barco

23

Confidential Information and for all damages, costs, and attorneys' fees arising from the breach;

5.     For judgment in Barco's favor and against Q4 for breach of the FMDSA for violating the covenant not to compete with Barco and for all damages, costs, and attorneys' fees arising from the breach;

6.     For judgment in Barco's favor and against Q4 for breach of the FMDSA and Purchase Order for failure to timely deliver Film Mirrors under the FMDSA and Purchase Order, including but not limited to the Demo Mirror, and for all damages, costs, and attorneys' fees arising from these breaches;

7.     For judgment in Barco's favor and against Q4 for breach of the FMDSA and Purchase Order for failure to honor Q4's warranty under those agreements, and for all damages, costs, and attorneys' fees arising from this breach;

8.     For damages, treble damages, attorneys' fees and costs under the Lanham Act for Q4's acts of unfair competition;

9.     For a declaration that Barco owns the exclusive rights to the Barco Intellectual Property and that Barco owns the exclusive rights to all designs, drawings, specifications and other documentation used by Q4 which are derived from Barco Intellectual Property, including the design of the Alleged Independent Q4 Mirror;

10.    A preliminary and permanent injunction prohibiting Q4 from: (i) using or disclosing the Barco Design or any other Barco Confidential Information; (ii) marketing or selling any collimating mirror derived from or based on the Barco Design or other Barco Confidential Information, including the Alleged Independent Q4 Mirror; (iii) using any molds or other tooling built in whole or in

24

part based on Barco Confidential Information; (iv) competing with Barco with for the sale of any collimating film mirrors or collimated display systems for the term of the non-compete provision in the FMDSA; and (v) making representations anywhere and to anyone, whether on its website or in any other media or documents, that it holds any rights in or to the design of film mirrors pursuant to the FMDSA and Purchase Order, including the Alleged Independent Q4 Mirror and any film mirrors developed for the Military Project;

11.     An order requiring Q4 to return to Barco all electronic or other documents constituting or reflecting the Barco Design or other Barco Confidential Information, including all documentation related to the Alleged Independent Q4 Mirror and to remove from its website and any other media or documents any representations of rights or ownership in the Alleged Independent Q4 Mirror and the film mirrors for the Military Project;

12.     For prejudgment interest;

13.     For attorneys' fees and costs under the FMDSA and as otherwise permitted by law; and

14.     All other legal and equitable relief that this Court deems just and appropriate.

Respectfully submitted,

/s/ James A. Dyer
James A. Dyer (0006824)
SEBALY SHILLITO + DYER
A Legal Professional Association
1900 Kettering Tower
Dayton, OH 45402
937/222-2500
937/222-6554 (fax)
jdyer@ssdlaw.com
*Attorneys for Plaintiff Barco, Inc.*

25

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

/s/ James A. Dyer _____ _____
James A. Dyer